WAIKIKI RESORT HOTEL, INC., Plaintiff-Appellant, *v.* CITY AND COUNTY OF HONOLULU; ERNEST YUASA, in his capacity as Director and Superintendent of the Building Department of the City and County of Honolulu; and HERBERT K. HORITA, Defendants-Appellees

NO. 7140

MARCH 6, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM, JJ., AND RETIRED JUSTICE MARUMOTO, ASSIGNED BY REASON OF A VACANCY

OPINION OF THE COURT BY MARUMOTO, J.

This case came before us on an appeal by Waikiki Resort Hotel, Inc., plaintiff below, from a judgment of the First Circuit Court, which:

(a) dismissed with prejudice the complaint filed by plaintiff in that court against the City and County of Honolulu; Ernest Yuasa, director and superintendent of the Building Department of the City and County of Honolulu; and Herbert K. Horita, as defendants, in Civil No. 50463; and

(b) affirmed the decision and order of the Building Board of Appeals of the City and County of Honolulu in its Case No. 309, which was appealed by plaintiff to that court in Civil No. 52936.

There are two questions for ultimate decision in this case. They are: first, whether the issuance of Building Permit No. 58584 by the Building Department to Horita was valid; and, second, if the permit was validly issued, whether it continued to be valid after its issuance and authorized Horita to proceed with the construction of the building described therein at all times pertinent to this case.

Building Permit No. 58584 was issued on November 26, 1975,

pursuant to an application filed by Horita with the Building Department on September 9, 1974.

The permit authorized Horita to construct Type I building (steel, iron, concrete, or masonry), 39 stories high, for Group H occupancy (hotel and apartment), containing:

(a) 144 residential units;

(b) floor area of 296,331 square feet; and

(c) basement area of 34,105 square feet

on a project site situated on the northwesterly side of Liliuokalani Avenue, between Koa Avenue and Kalakaua Avenue, in Honolulu.

The project site consists of three parcels of land, containing a total area of 39,045 square feet, shown on the tax map of the First Taxation Division of the State of Hawaii as the following Tax Map Key (TMK) parcels:

TMK 2-6-23:  Parcel 1, area 9,868 square feet;

TMK 2-6-23:  Parcel 3, area 5,028 square feet;

TMK 2-6-23:  Parcel 8, area 24,149 square feet.

Plaintiff owns and operates a hotel at 2060 Koa Avenue, directly opposite the project site.

The accompanying sketch shows the location of plaintiff's hotel, in relation to the project site, and the location of each parcel of the project site.

Plaintiff filed its complaint in Civil No. 50463 on January 18, 1977.

In the complaint, plaintiff sought a judgment declaring Building Permit No. 58584 to be null and void; preliminarily and permanently restraining Horita from constructing the building described in the permit; and awarding it damages, attorneys' fees and costs incurred in the action, and such other relief as the court shall deem just and appropriate.

Such judgment was sought on a statement of claim consisting of eight counts.

In Counts I through VII, plaintiff alleged that the Building Department issued Building Permit No. 58584, and continued the same in force, in violation of applicable provisions of Hawaii Revised Statutes and ordinances of the City and County of Honolulu.

The provisions of the statutes and ordinances alleged to have been violated in those counts are as follows:

Count I.   Comprehensive Zoning Code (CZC), Sec. 21-281(c), relating to joint development of two or more adjacent zoning lots;

Count II.   Ordinance No. 4434, relating to requirements for fire sprinkler system;

Count III.   HRS § 343-4, relating to requirement of environmental impact statement;

Count IV.   HRS Ch. 344, relating to environmental policies of the State of Hawaii;

Count V.   Revised Ordinances, 1969 Sec. 18-5.4(b), relating to revocation of building permit;

Count VI.   Ordinance No. 4362, Sec. 3(C)(3)(d), relating to extension of time of building commencement requirement under the special application provision of the ordinance;

Count VII.   Ordinance No. 4529 relating to interim shoreline protection under HRS Ch. 205A, Part II.

In Count VIII, plaintiff alleged damages it would suffer by reason of obstruction of light, air, and view occasioned by the construction of any building or buildings under the permit.

The complaint was filed upon rejection by Yuasa of plaintiff's demand that the permit be revoked. The demand for revocation was predicated on alleged violation by the Building Department of the

statutory and ordinance provisions mentioned in Counts I through VII of the complaint.

The circuit court held its first hearing in Civil No. 50463 on August 1, 1977, when plaintiffs' motion for preliminary and permanent injunction and declaratory relief, based on Counts V and VI, was presented to it.

At that hearing, the court raised a question regarding its jurisdiction to consider the matter before Yuasa's decision was appealed to, and ruled upon, by· the Building Board of Appeals.

Under Revised Ordinances 1969, Sec. 16-1.1(4), the Building Board of Appeals is authorized to hear appeals from decisions of the building official in the administration of the Building Code, and to affirm, reverse or modify, wholly or partly, the decisions appealed from.

The question raised by the court was resolved by the parties agreeing to have plaintiff file a petition appealing Yuasa's decision to the Board.

Plaintiff filed its petition with the Board on August 10, 1977. In the petition, plaintiff did not mention Counts I, II, III, IV, VII and VIII of the complaint, and limited its appeal to the issues in Counts V and VI.

The Board held its hearing on the petition on September 8, 1977, at which a deputy corporation counsel of the City and County of Honolulu acted as attorney for the Building Department and another deputy corporation counsel was present as attorney for the Board.

At the hearing, the deputy corporation counsel representing the Building Department presented the case in chief, and plaintiff's attorney confined his participation to:

(a) cross-examination of the witnesses who testified for the Building Department;

(b) introduction of documentary evidence, consisting of 18 documents containing 93 pages, without any statement to enlighten the Board regarding their significance or relevancy; and

(c) delivery of summation based entirely on the testimonies of the witnesses for the Building Department, without any reference to the documentary evidence introduced by him.

The case presented to the Board by the deputy corporation counsel, on behalf of the Building Department, covered the following issues:

First: Whether Horita commenced work under the permit within the time specified in Revised Ordinances 1969, Sec. 18-5.4(b);

Second: Whether Horita suspended or abandoned the work under the permit, at any time after its commencement, for the period specified in Section 18-5.4(b); and

Third: Whether the provision in Ordinance No. 4617, which requires that all foundation and structural work under a building permit be completed up to the ground floor level, within 18 months after the issuance of the permit, applied to Horita from the date of his permit or from the effective date of that ordinance.

All three issues were involved in Count V. Count VI involved only the first issue.

At the time the permit was issued, Revised Ordinances 1969, Sec. 18-5.4(b) provided:

Revocation for Non-work. The Building Official may revoke a permit issued under the provisions of this chapter if the building or work authorized by such permit is not commenced within 90 days from the date of such permit, or if the building or work authorized by such permit is suspended, or abandoned at any time after the work is commenced for a period of 90 days, ***;

Ordinance No. 4617, which took effect on August 9, 1976, did the following:

(a) added a third paragraph to Revised Ordinances 1969, Sec. 18-5.3, reading as follows:

Every permit shall be valid for a period of three years from the date of its issuance or date of this ordinance, whichever is later, subject to satisfactory work progress as contained in Section 18-5.4, Subsections (b) and (c)***;

(b) amended Section 18-5.4(b) by substituting 120 days for 90 days specified in the pre-existing provision;

(c) added a third paragraph to Section 18-5.4(b), reading as follows:

For the purpose of this Section, suspension or abandonment

shall mean a slowdown or cessation of the activity of putting construction into place to the extent that construction of the building or structure cannot be completed within the time specified in Section 18-5.3. Offsite work such as prefabrication of building components specifically for a project may be considered time spent for work at the project site. Repetitive clearing and grubbing and movement of equipment without adding substance toward the completion of the building or structure shall not be considered as work; and

(d) added subsection (c) to Section 18-5.4, reading as follows: Progress of Work. At the end of eighteen (18) months after a building permit is issued, all foundation and structural work for the building or structure up to the ground floor level shall be completed;***.

In presenting the case in chief, the deputy corporation counsel called Stephen Beirne, building inspector, to testify on the first and second issues in Count V; and Herbert Muraoka, chief of building safety, to testify on the third issue and supplement Beirne's testimony on the first and second issues.

On the first issue, Beirne's testimony on direct examination and cross-examination, and in his deposition in evidence before the Board, showed the following:

On February 20, 1976, which was 90 days after the date of the permit, Horita had his contractor, Hawaiian Dredging Company, drive one pile on the project site. The pile was driven on line d/4a on TMK 2-6-23: Parcel 8. Before driving the pile, it was necessary for the contractor to have the site surveyed to determine line d/4a accurately because the pile would constitute a footing for the structural column of the building described in the permit, and would definitely be used for that purpose. In driving the pile, the contractor mobilized equipment and crew capable of driving 100 or more piles. The cost of driving the single pile ranged between $10,000 and $15,000. Under the guidelines followed in the Building Department at that time, in the absence of definition of commencement of work in the Building Code, the work done by the contractor was sufficient to satisfy the code requirement for commencement of work.

With respect to the second issue, Beirne testified at the hearing,

and in his deposition, as follows:

On May 20, 1976, which was 90 days after it drove the single pile, Hawaiian Dredging Company began demolishing the two-story building on TMK 2-6-23: Parcel 1. The work was done under Building Permit No. 65445, dated April 30, 1976. The building was of hollow-tile, plaster, and stucco construction. The first floor was used for commercial purposes, and the second floor had hotel rooms. Demolition began with gutting of the building. Gutting consisted of tearing partitions, and removing salvageable materials such as plumbing and electrical fixtures, window glass and doors. When the work continued to about the first part of June 1976, Horita decided to keep the building standing, restore the items which had been removed, and proceed to demolish the four-story building on TMK 2-6-23: Parcel 8. At that time, just the shell of the two-story building remained standing. Subsequently, the building was restored to enable its occupancy by commercial tenants.

On June 8, 1976, Horita had his demolition contractor begin demolishing the four-story building. The contractor for the work was Tajiri Lumber, Ltd. The building extended along the entire length of Koa Avenue frontage of the project site, and contained 40 hotel rooms. The work was done under Building Permit No. 66960, dated June 3, 1976. The permit was issued on an application filed on May 19, 1976, one day before the demolition of the two-story building was begun. The demolition of the four-story building was completed on July 7, 1976.

The demolition of the two-story building and the four-story building constituted work preparatory to the construction of the building described in Building Permit No. 58584, but separate permits for demolition were obtained because the Building Code required such separate permits.

On November 1, 1976, which was 117 days after the completion of demolition of the four-story building, Hawaiian Dredging Company brought pile driving equipment to the project site, and began pile driving operation, which was continued to November 16, 1976. At the time the contractor began that work, Ordinance No. 4617 had amended the 90-day period specified in Revised Ordinances Sec. 18-5.4(b) to 120 days. The pile driving took

place in the area bounded by Koa Avenue and Liliuokalani Avenue, where the major portion of the 39-story tower would be located. The pile driving was preceded by load-testing done by Continental Drilling Company, Horita's load testing contractor, on September 22, 1976.

On December 2, 1976, Horita's load testing contractor brought equipment to the project site and did further load testing, which was completed on December 9, 1976. Building Permit No. 58584 specifically required load testing.

On April 4, 1977, which was 116 days after the load testing contractor did the required load testing, Hawaiian Dredging Company returned to the project site, and did additional pile driving until April 7, 1977.

Thereafter, on August 4, 1977, which was 119 days after the last pile driving was done on April 7, 1977, the contractor again returned to the project site, and engaged in pile driving on that day and on the following day.

Beirne conducted his last inspection of the project on August 5, 1977, before testifying at the Board hearing 34 days later, on September 8, 1977. He estimated that, by that time, between 40 to 50 piles were in place, out of a range of about 700 piles which were required for the foundation of the building described in the permit.

According to Beirne, the work done on the project site fell right into the guidelines of the Building Department and was more toward maximum for intermediate work, and Horita could have kept within the guidelines with less work.

Beirne's testimony was confirmed by Muraoka at the outset of his testimony, in which he stated that "as far as issues No. 1 and No. 2, commencement of work and suspension and abandonment of work the department's position is that sufficient work was performed to satisfy the two issues."

On the third issue, if subsection (c) of Revised Ordinances 1969, Sec. 18-5.4, which was added thereto by Ordinance No. 4617, applied to Horita from the date of his permit, it would have been necessary for Horita to complete all foundation and structural work of the building described in his permit, up to the ground floor level, not later than May 26, 1977, because the permit was issued on November 26, 1975; but, if the subsection applied to Horita from

the effective date of Ordinance No. 4617, then Horita would have had until February 9, 1978, to complete such work because the effective date of the ordinance was August 9, 1976.

Plaintiff contended that the subsection applied to Horita from the date of the permit because of the specific language therein that the required work be done at the end of 18 months "after a building permit is issued."

Muraoka testified that it was the position of the Building Department that the subsection applied to Horita from the effective date of Ordinance No. 4617, and that, in taking that position, the department followed the opinion of the Corporation Counsel to that effect.

Upon the conclusion of the hearing, the Board ruled in favor of the Building Department on all three issues, and entered a decision and order sustaining Yuasa's decision and denying plaintiff's petition that Building Permit No. 58584 be declared null and void and revoked.

Plaintiff appealed the decision and order of the Board to the circuit court in Civil No. 52936 for judicial review pursuant to HRS § 91-14(a).

In the circuit court, Civil No. 52936 was consolidated with Civil No. 50463 for joint hearing pursuant to HRCP, Rule 42(a), and the parties entered into the following stipulation:

(a) to submit all matters arising under Counts I, III, IV, V, VI, and VII of Civil No. 50463 for decision by the court without further trial;

(b) to accept the determination by the court of the issues raised in the appeal of the decision and order of the Board as disposing of the issues in Counts V and VI.

(c) to base the submission under the stipulation on the pleadings, files, documents, and memoranda then on record; supplemental memoranda to be filed by the parties; and oral argument thereon;

(d) to try Count II only in the event the court should find in favor of defendants on all matters to be determined under the stipulation; and

(e) to try Count VIII only in the event the court should find in favor of plaintiff on any of the issues in the case.

After the filing of supplemental memoranda by the parties and the presentation of argument thereon and on the pleadings, files, documents, and memoranda previously on record, the court found in favor of defendants on all issues in Counts I, III, IV, and VII, and affirmed the decision and order of the Board, thereby disposing of Counts V and VI.

With regard to Counts II and VIII, the Court disposed of the same by granting Horita's motion for summary judgment in his favor on those counts:

On the appeal to this court from the judgment of the circuit court, plaintiff presented the following questions for decision, pursuant to Rule 3(b)(3) of the rules of this court:

First: Whether Building Permit No. 58584 was invalid from the date of its issuance;

Second: Whether the construction of the building described in Building Permit No. 58584 was prohibited without first obtaining a special permit under Ordinance No. 4529, assuming that the permit was validly issued;

Third: Whether the Building Board of Appeals erred in its denial of plaintiff's petition that Building Permit No. 58584 be declared null and void and revoked; and

Fourth: Whether actions of the Building Department in connection with Building Permit No. 58584 were unauthorized and void for failure to comply with the statutes of the state of Hawaii relating to protection of the environment.

The first question is concerned with the issues in Counts I and II; the second question with the issues in Count VII; the third question with the issues in Counts V and VI; and the fourth question with the issues in Counts III and IV. Our answers to those questions will determine the answers to the questions for ultimate decision posed at the outset of this opinion.

On the first question, plaintiff contends that Building Permit No. 58584 was invalid from the date of its issuance for two reasons: first, it was issued in violation of CZC, Sec. 21-281(c); and, second, the building plans with respect to which it was issued, did not comply with the fire sprinkler system requirements of Ordinance No. 4434.

With respect to the contention regarding the alleged violation of CZC, Sec. 21-281(c), that code provision states that an owner of adjacent lots, who believes that joint development of his property

will result in a more efficient use of the land, may apply for a Special Use Permit to undertake such development; provided that, in the case where the main building proposed in the joint development crosses all common lot lines of the adjacent lots, a Special Use Permit is not required.

It is apparent that plaintiff intended to allege violation of Sec. 21-281(c) in Count I by alleging that Building Permit No. 58584 was issued for the construction of a new hotel and commercial spaces on three separate zoning lots, and that, prior to and at the time of the issuance of the permit, the three zoning lots were not consolidated. Those allegations were admitted by defendants.

However, plaintiff's allegations in Count I, and defendants' admission of the same, were not sufficient to establish a violation of Sec. 21-281(c).

Under the proviso in Sec. 21-281(c), consolidation of the zoning lots in a joint development is not necessary if the main building proposed in the development crossed all common lot lines of the project site. In this case, plaintiff, as the party asserting that Building Permit No. 58584 was issued in violation of Sec. 21-281(c), had the burden of establishing that the main building shown on the plans, with respect to which the permit was issued, did not cross all common lot lines of the project site. Plaintiff did not meet that burden.

Plaintiff sought to meet its burden in that regard by relying on the following:

(a) a sketch which was appended to Beirne's report as the building inspector of the project approved in Building Permit No. 58584;

(b) portions of Beirne's testimony on direct examination and cross-examination at the Board hearing; and

(c) an affidavit of L. Dixon Steinbright, a licensed architect, filed in the circuit court by plaintiff in opposition to the affidavit of Thomas D. Perkins, also a licensed architect, which was attached as an exhibit to defendants' memoranda filed pursuant to the stipulation of the parties to submit Counts I, III, IV, V, VI, and VII for decision by the circuit court without further trial.

The sketch upon which plaintiff relied is reproduced on the following page.

In his deposition, Beirne stated that the sketch was "the plot plan of the property where the building is to be built." We will refer to the sketch as the plot plan, hereafter in this opinion.

Plaintiff contended that the plot plan showed that the main building did not cross the common lot lines. We disagree with that contention.

The plot plan shows the outer boundaries of the project site in solid lines. Within the outer boundaries, a solid line delineates a narrow strip along the Koa Avenue and Liliuokalani Avenue frontage of TMK 2-6-23:8 and the Liliuokalani Avenue and Kalakaua Avenue frontage of TMK 2-6-23:1, and another solid line delineates a narrow strip along the Kalakaua Avenue frontage of TMK 2-6-23:3.

Presumably, the narrow strips so delineated are building setback areas.

Within TMK 2-6-23:8 is an area delineated in solid lines and marked "39 story", and a contiguous area delineated in solid lines and marked "3 story".

The description "2-story" appears within TMK 2-6-23:1 and also within TMK 2-6-23.3, but the common lot lines between TMK

2-6-23:8 and TMK 2-6-23:1 and between TMK 2-6-23:8 and 2-6-23:3 are delineated, not in solid lines, but in broken lines.

A reasonable reading of the plot plan, as thus described, leads to the conclusion that the project approved in Building Permit No. 58584 consisted of a single building occupying the entire project site, other than the setback areas, with one portion being 39 stories high, another portion being 3 stories high, and the third portion being 2 stories high, and the 2-story portion crossing the common lot lines into TMK 2-6-23:1 and TMK 2-6-23:3.

Such conclusion is supported by the statement in Building Permit No. 58584 that the building approved therein would have a basement containing an area of 34,105 square feet.

The basement area of 34,105 square feet is 9,956 square feet larger than the area of TMK 2-6-23:8, which is 24,149 square feet; 4,928 square feet larger than the combined area of TMK 2-6-23:8 and TMK 2-6-23:3, which is 29,177 square feet; and 28 square feet larger than the combined area of TMK 2-6-23:8 and TMK 2-6-23:1, which is 34,017 square feet, even without deducting the areas within the setback lines.

So much for plaintiff's contention based on the plot plan. We will now proceed to a consideration of plaintiff's contention based on Beirne's testimony at the Board hearing.

At the Board hearing, Count I was not in issue, and Beirne's testimony, on which plaintiff relied, was given in response to questions regarding the locations on the project site where pile driving took place.

On direct examination, Beirne testified that pile driving took place "on the site bounded by Koa Avenue and Liliuokalani Avenue, in other words, the major portions of the site where the super structure tower will be located."

In his testimony on cross-examination, Beirne referred to the plot plan, and stated that the portion of the project site fronting Koa Avenue, indicated by TMK 2-6-23:8, showed "the area where the proposed 39-story tower will be located."

It will be noticed that Beirne did not refer to the structure to be located on TMK 2-6-23:8 as the main building, but as the super structure tower or as the 39-story tower.

In Webster's Third New International Dictionary of the English

Language Unabridged (1961), the word "superstructure" is defined as a structure built on or as a vertical extension of something else, and the word "tower" is defined as a building or structure designed primarily for elevation, that is high relative to its surroundings, which may stand apart or be attached to a larger structure.

Thus, characterizing the proposed structure as superstructure or 39-story tower does not establish it as the main building.

In connection with plaintiff's contention based on Steinbright's affidavit, it may be stated that, in our opinion, both Perkins' affidavit and Steinbright's affidavit were improperly presented to the circuit court.

Both affidavits were presented to the circuit court after the parties stipulated to submit Counts I, III, IV, V, VI, and VII for decision by the circuit court without further trial. According to the stipulation, the submission was based "on the pleadings, files, documents, and memoranda presently on record." Those affidavits were not on record when the parties entered into the stipulation.

Be that as it may, even if Steinbright's affidavit required consideration, it did not establish that the main building approved in Building Permit No. 58584 did not cross the common lot lines of the project site. Steinbright stated in his affidavit:

The plans on file with the Building Department do show that the project authorized by Permit No. 58584 consists of a main tower (in which all of the apartment units are located) and contiguous commercial and parking structures. The main tower (which is an H-2 zoning use) is located entirely on Lot 2-6-23:8, which is the H-2 zoned property.

It will be noticed that Steinbright described the structure located entirely on TMK 2-6-23:8 as the main tower and not as the main building.

The statement that the project consisted of a main tower and contiguous commercial and parking structures implied that the structure described as the main tower would not be a free standing structure but a structure attached to a larger building. In Webster, the word contiguous is defined as next or adjoining with nothing similar intervening; continuous, unbroken, uninterrupted; touching or connected throughout.

Also, Steinbright did not state that the contiguous commercial and parking structures did not cross the common lot lines of the

project site; nor did he state that such structures were not for H-2 zoning use or that TMK 2-6-23:1 and TMK 2-6-23:3 were not H-2 zoned properties.

We hold that Building Permit No. 58584 was not issued in violation of CZC, Sec. 21.281(c).

Plaintiff's contention that Building Permit No. 58584 was invalid because the building plans with respect to which it was issued, did not comply with the fire sprinkler system requirements of Ordinance No. 4434 requires a consideration of Ordinance No. 3800 and Ordinance No. 4381, in addition to Ordinance No. 4434.

Ordinance No. 3800 is not in the record, although it was mentioned in Yuasa's letter to plaintiff. We take judicial notice of that ordinance because a certified copy of the same is on file in the office of the chief clerk of the First Circuit Court. *Life of the Land, Inc. v. City Council,* 61 Haw. 390, 606 P.2d 866 (1980).

The ordinance took effect on December 23, 1971, before Horita filed his application for building permit, and was in force on September 9, 1974, when Horita's application was filed. It adopted Uniform Building Code, 1970 Edition, Volume I, subject to 110 amendments, and incorporated the same in Revised Ordinances, Chapter 16 (Building Code), Sec. 16-1.1.

The uniform building code, and the amendments thereto, so incorporated in the revised ordinances, will hereafter be referred to as Ordinance No. 3800 building code.

Ordinance No. 3800 building code did not contain the fire sprinkler system requirements mentioned by plaintiff.

Plaintiff has not contended that Ordinance No. 3800 building code was violated in connection with the issuance of Building Permit No. 58584.

Ordinance No. 4381, which took effect on December 31, 1974, after Horita filed his application for building permit, added five amendments to Ordinance No. 3800 building code, among which was the addition of Section 1807, requiring fire sprinkler system protection for High Rise Group H Occupancies and Group F, Division 2 Office Buildings having floors for human occupancy located more than 75 feet above the highest grade.

That ordinance provided that it would not be applicable to any structure for which an application for building permit was filed with

the Building Department before its effective date, subject to the limitations stated therein. The provision will hereafter be referred to as the exemption provision.

The nature of the limitations on the application of the exemption provision need not be stated here for the reasons stated below.

As noted earlier in this opinion, plaintiffs' contention based on its claim of violation of the fire sprinkler system requirements of Ordinance No. 4434 was alleged in Count II. In the circuit court, that count was decided against plaintiff on defendants' motion for partial summary judgment.

In opposing defendants' motion for partial summary judgment, plaintiff relied solely on an affidavit of Gerald H. W. Lum, a licensed architect, which contained statements based on Lum's examination of the comments and correspondence in the records of the Building Department pertaining to Horita's application for building permit.

Lum's affidavit did not have attached thereto sworn or certified copies of the comments and correspondence referred to therein, nor were sworn or certified copies of such documents served therewith, thus violating the provision of HRCP, Rule 56(e), which reads:

Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

The circuit court could not have considered Lum's affidavit in connection with defendants' motion for partial summary judgment because of such violation. *Pacific Concrete Federal Credit Union v. Kauanoe,* 62 Haw. 334, 614 P.2d 936 (1980); *Cane City Builders v. City Bank of Honolulu,* 50 Haw. 472, 443 P.2d 145 (1968).

Furthermore, plaintiff stated in the opening brief which it filed in this court:

On this appeal, Plaintiff is not urging any violation of Ordinance No. 4381. Plaintiff contends that the fire sprinkler provisions of Ordinance No. 4434 are the applicable provisions.

Ordinance No. 4434, which took effect on May 12, 1975, after Horita filed his application for building permit but before Building Permit No. 58584 was issued, adopted Uniform Building Code, 1973 Edition, subject to 131 amendments, and incorporated the same in Revised Ordinances 1969, Chapter 16, Sec. 16-1.1.

The uniform building code, and the amendments thereto, so incorporated in the revised ordinances will hereafter be referred to as Ordinance No. 4434 building code.

An examination of Ordinance No. 4434 building code and Ordinance No. 3800 building code, including the amendments added thereto by Ordinance No. 4381, shows that Ordinance No. 4434 building code was an updated revision and compilation of Ordinance No. 3800 building code and the amendments added thereto.

Ordinance No. 4434 building code contained Section 1807, which was identical in language with Section 1807, which was added to Ordinance No. 3800 building code by Ordinance No. 4381, except for updating of references in subsection (b) and subsection (d) to the editions of the publications of the National Fire Protection Association, the edition referred to in Ordinance No. 4434 building code being the 1974 Edition both in subsection (b) and subsection (d), and the editions referred to in Ordinance No. 4381 being the 1972 Edition in subsection (b) and the 1971 Edition in subsection (d).

Thus, Section 1807 in Ordinance No. 4434 building code was not a new provision, but a carryover into the revision of Section 1807, which was added to Ordinance No. 3800 building code by Ordinance No. 4381.

Basically, courts apply the same rules of construction to municipal ordinances as they do to statutes. Sutherland, Statutory Construction, *supra,* § 30.06 (1972). There are some exceptions, but none of the exceptions applies to any situation in this case.

Statutes carried into a revision retain their original effect unless the legislative intent to make a change is clear. *Territory v. Overbay,* 23 Haw. 91 (1915); Sutherland, Statutory Construction, 4th Edition, § 28.14.

Ordinance No. 4434 did not contain an exemption provision equivalent to the exemption provision in Ordinance No. 4381. However, it also did not contain any provision which indicated a legislative intent to change the original effect of Section 1807 in Ordinance No. 4391.

The original effect of Section 1807 in Ordinance No. 4391 was that, by the operation of the exemption provision, it did not apply to any structure for which an application for building permit had been filed before the effective date of the ordinance.

For the reasons stated above, the fire sprinkler system requirements of Section 1807 of Ordinance No. 4434 building code was not

violated in connection with the issuance of Building Permit No. 58584.

However, it may be stated that Section 2 of the Ordinance provided:

nothing in this Ordinance shall be construed to prohibit any person from erecting, constructing, enlarging, altering, repairing, moving, improving, removing, converting or demolishing any building or structure in the City, or causing the same to be done pursuant to the provisions of the new Code and the amendments thereto adopted hereunder.

In that connection, Horita stated in his answering brief:

A final note in this area is that even if there is a determination by this Court that in some fashion Building Permit No. 58584 was not exempt from the fire sprinkler provisions, the permit would not be void *ab initio* but rather Horita would simply be required as a part of his project to include a fire sprinkler system,

thereby indicating his willingness to follow the fire sprinkler system requirements of Section 1807 of Ordinance No. 4434.

With respect to the second question presented for decision on this appeal, we hold that the obtaining of a special permit under Ordinance No. 4529 was not a prerequisite to the construction of the building described in Building Permit No. 58584.

Ordinance No. 4529 established the area, and rules and regulations, for an interim shoreline protection district on Oahu, pending the implementation of a coastal zone management program under Coastal Zone Management Act of 1972, Public Law 92-583, and HRS §§ 205A-1 and 205A-2. The interim district established in the ordinance included a portion of the project site covered in Building Permit No. 58584. HRS §§ 205A-1 and 205A-2 are presently incorporated in HRS Ch. 205A, Coastal Zone Management, Part I, Long Range Goals.

The ordinance was enacted pursuant to the authority contained in HRS Ch. 205A, as amended by Session Laws of Hawaii (SLH) 1975, Act 176, which added Part II, Interim Controls, to that chapter. It took effect on December 1, 1975, five days after the issuance of Building Permit No. 58584.

In construing the applicability of Ordinance No. 4529 to the construction of the building described in Building Permit No. 58584, SLH 1975, Act 176, Section 3, is pertinent. That section

provided:

 This part shall not apply to \*\*\* structures for which a building permit \*\*\* was issued prior to December 1, 1975,\*\*\*.

 A municipal ordinance, which is enacted pursuant to authority contained in a state statute is invalid if it conflicts with the enabling statute.

 A test to determine whether an ordinance conflicts with a statute is whether it prohibits what the statute permits or permits what the statute prohibits. *Cincinnati & Suburban Bell Telephone Co. v. City of Cincinnati,* 6 Oh. App.2d 105, 215 N.E.2d 631 (1964); *Local Union No. 26 v. City of Kokomo,* 211 Ind. 72, 5 N.E.2d 624 (1937); *City of Grand Haven v. Grocer's Co-op Dairy Co.,* 330 Mich. 694, 48 N.W.2d 362 (1951); Sutherland, Statutory Construction, *supra,* § 30.05.

 Ordinance No. 4529 would be valid only if it should be construed to apply to construction of buildings for which building permits were issued on and after December 1, 1975, and it could not be applied to the construction of the building described in Building Permit No. 58584, which was issued before that date.

 On the third question for decision on this appeal, it is plaintiff's contention that the Building Board of Appeals erred in failing to declare Building Permit No. 58584 null and void and revoked, for the following reasons:

 First: Building Permit No. 58584 should have been revoked because the building or work authorized thereunder was not commenced within the time specified in Revised Ordinances 1969, Sec. 18-5.4(b);

 Second: Even if the work authorized in the permit was commenced within the time specified in Sec. 18-5.4(b), the permit was still subject to revocation because the work was abandoned or suspended for the period mentioned in the ordinance;

 Third: All foundation and structural work for the building described in the permit was not completed up to the ground floor level at the end of 18 months after the issuance of the permit, as required in Sec. 18-5.4(c); and

 Fourth: The decision and order of the Board was based on unlawful procedure in that:

 (a) one of the members of the Board, who participated in the hearing had a conflict of interest;

(b) the office of Corporation Counsel not only advised the Board in connection with the conduct of the hearing and its deliberation, but also represented the Building Department and Yuasa before the Board, and further wrote an opinion for the Mayor, which was introduced in evidence;

(c) the Board limited plaintiff's cross-examination on critical issues; and

(d) the Board was influenced by facts which were neither in the record nor judicially noticeable.

There is no merit in any of the reasons given by plaintiff.

With reference to the first and second reasons, the Building Department, as the agency charged with the responsibility of administering Sec. 18-5.4(b), had formulated guidelines to be followed in determining the activities which would constitute commencement of the building or work authorized by the building permits issued by it, and the activities which would keep the permits in force after the commencement of work.

The guidelines were formulated because the terms "commenced," "suspended," and "abandoned," used in Sec. 18-5.4(b), were broad and indefinite in meaning, and it was necessary to define their scope in connection with the administration of that provision of the ordinance.

Under the guidelines, driving of pile which would be a part of the foundation of the building authorized in a building permit constituted commencement of the building or work mentioned therein; and, after the commencement of work, activities such as demolition of existing buildings within the bounds of the building to be constructed under a permit, and installation of components which would become parts of the completed building, including driving of piles, were accepted as work which kept the permit in force.

Beirne's testimony at the Board hearing, which was supported by Muraoka, showed that the guidelines were followed in determining the sufficiency of the work done by Horita under Building Permit No. 58584 to satisfy the requirements of Sec. 18-5.4(b); that the work done on the project site fell right into the guidelines, was more toward maximum for intermediate work, and Horita could have kept within the guidelines with less work.

It is a well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carry-

ing out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous. *Estrin v. Moss,* 221 Tenn. 657, 430 S.W.2d 345 (1968); *Udall v. Tallman,* 380 U.S. 1 (1965); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294 (1933).

The following statement in *Norwegian Nitrogen Products Co. v. United States, supra,* 315, is pertinent:

> [A]dministrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. ***The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.

With reference to the third reason, plaintiff's contention is based on a literal reading of the language of subsection (c) of Sec. 18-5.4, which was added to that section by Ordinance No. 4617, dated August 9, 1976, as contrasted to the language of the third paragraph of Sec. 18-5.3, which was added to that section by the same ordinance; that is, on the fact that Sec. 18-5.4(c) requires that all foundation and structural work for the building or structure be completed up to the ground floor level "at the end of eighteen months after a building permit issued," while the third paragraph of Sec. 18-5.3 provides that every permit shall be valid for a period of three years from the date of its issuance "or date of this ordinance, whichever is later."

It will be noticed that in Sec. 18-5.4(c), the words "or date of this ordinance, whichever is later" do not appear.

The Board rejected plaintiff's contention, and, in doing so, it stated:

> [T]he provision in Section 18-5.4(c) pertaining to progress of work is silent as to the beginning of the 18-month period. However, it is a basic rule of statutory construction that all statutes are to be construed as having only prospective application unless the purpose and intention of the legislature is [sic] to give them a retrospective effect, is expressly declared or is necessarily implied by the language used. In this case, there is no express

declaration in the statute [sic], as amended, requiring retrospective application to those permits issued prior to the effective date of this Ordinance, nor can retrospective application be implied from the language used.

In connection with that statement, plaintiff argued in its opening brief on this appeal:

The ordinance in question is *not* silent as to when the 18-month period commences. It specifically states that "at the end of eighteen months after a building permit is issued," certain work must be completed. ***The Board has no authority to ignore this express language***.

We agree with the decision of the Board, but not with its reasoning.

The decision of the Board reflects the principle of statutory construction, incorporated in HRS § 1-3, that no law has any retrospective operation unless otherwise expressed or obviously intended.

A literal reading of the language of Sec. 18-5.4(c) supports plaintiff's argument.

However, there is another principle of statutory construction, which is set forth in HRS § 1-15, as follows:

*Construction of ambiguous context.* Where the words of a law are ambiguous:

(1) The meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

(2) The reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning.

(3) Every construction which leads to an absurdity shall be rejected.

That principle has been followed consistently in this jurisdiction since it was first mentioned in *Shillaber v. Waldo,* 1 Haw. 21 (1848).

The most recent decision of this court which depended on the application of that principle is *State v. Sylva,* 61 Haw. 385, 605 P.2d 496 (1980). In that case, this court stated, in construing HRS § 853-4(7), relating to deferred acceptance of guilty plea:

Subsection (7) when read independently of the other subsections

appears to be clear and unambiguous,***. But statutory language must be read in the context of the entire statute and construed in a manner consistent with the purposes of the statute. ***Uncertainty as to the meaning of the statute may arise from the fact that giving a literal interpretation to the words would lead to such unreasonable, unjust, impracticable, or absurd consequences that they could not have been intended by the legislature.

The language of subsection (c), which was added to Sec. 18-5.4 by Ordinance No. 4617, is seemingly unambiguous. But, in the context of other provisions of the ordinance, the literal application of that language would lead to unreasonable and absurd consequences which could not have been intended by the City Council.

Ordinance No. 4617 was not a special legislation designed to apply to any particular holder of a building permit. It was intended to apply to all holders of building permits.

It is conceivable that, at the time Ordinance No. 4617 was enacted, there were outstanding building permits which had been issued more than 18 months before its enactment and which were still in compliance with all ordinance provisions applicable thereto, as administered by the Building Department. A literal application of the language of the ordinance would have rendered such permits void without any forewarning to permit holders. Such unfair consequence could not have been intended by the City Council in enacting the ordinance and by the Mayor in approving the same.

The Board record shows that, after the enactment of Ordinance No. 4617, a member of the City Council was concerned with the problem and had expressed a willingness to introduce a bill to amend the same, but no further action was taken in the City Council because the Mayor approved the ordinance upon the advice of the office of Corporation Counsel that "[t]he intent of subsection (c) as gleaned from its legislative history is that such requirement being a new requirement is to be determined from the date of the ordinance for pre-existing and outstanding permits."

With reference to the fourth reason, we discuss below the grounds on which we base our holding that plaintiff's contentions thereunder are without merit.

    (a) Participation of a Board member, who had a conflict of

interest, in the Board hearing and the Board hearing and decision.

This contention is concerned with the participation of Edmund Kellett in the Board hearing and the Board decision and order.

Under Revised Ordinances 1969, Sec. 16-1.1(4)(a), which was in effect at the time the Board held its hearing in plaintiff's case and rendered its decision thereon, the Board consisted of nine members appointed by the Mayor and approved by the City Council, and Sec. 16-1.1(4)(b) of the same ordinance required an affirmative vote of five or more members for any Board action.

Kellett was one of the Board members. Among the other Board members were Gilbert Scott, Sr., and George Kaneko.

The record in this case shows the following facts regarding Kellett's participation:

*September 2, 1977.* There was a Board meeting at which all Board members were present. At the meeting, Kellett submitted a letter in which he disclosed the possibility that he would be negotiating a contract, as a general contractor, to construct a steel structure in the project covered in Building Permit No. 58584. In connection with the disclosure, Kellett stated that he felt he could "render a full and impartial vote," but wanted the Board to be aware of "the possible conflict." The Board discussed the disclosure at length. In the course of the discussion, Scott expressed the view that it would be in the best interest if Kellett was excused, lest any Board action in favor of defendants might be suspect, and Kaneko concurred in that view. On the legal question posed by the disclosure, the deputy corporation counsel, who was assigned to the Board stated that the decision regarding Kellett's participation was up to the Board and Kellett, although there seemed to be a definite conflict. Kellett then inquired whether, if the Board voted that there was no conflict, he still had to go to any agency as far as ethics was concerned. The deputy corporation counsel answered the question in the negative, and stated that the Board could make all decisions on the matter. Upon conclusion of the discussion, the Board voted on a motion which stated that "Mr. Kellett not disqualify himself and be a participant at the hearing." The motion was carried, with one negative vote and two abstentions. Scott cast the negative vote. Kellett and Kaneko were the abstaining members.

*September 8, 1977.*   Board hearing was held with eight members in attendance, including Kellett, Scott, and Kaneko. The absent member was Michael Moon.

*September 15, 1977.*   The Board met in closed session to deliberate on the issues submitted at the hearing. The meeting was attended by the eight members who were at the Board hearing. Upon conclusion of the deliberation, the Board unanimously voted in favor of defendants. Scott and Kaneko participated actively in the deliberation, and either moved or seconded the motions on which votes were taken at the meeting.

*October 7, 1977.*   Board meeting was held, attended by seven of the eight members who were at the Board hearing, Scott being the absent member. The Board voted unanimously to approve the findings of fact, conclusions of law, and the decision and order.

The foregoing facts pose the question whether Kellett's participation in the Board action of September 15, 1977, and in the Board decision and order of October 7, 1977, vitiated the Board decision and order, although, even without counting his vote, the Board action of September 15, 1977, had the affirmative votes of seven members, or two more than the five votes required under the applicable ordinance provision, and the Board decision and order had the affirmative votes of six members, or one more than the required five votes.

On such question, decisions are not uniform, even in cases where the participating member was clearly disqualified because of his present and immediate interest in the result or by reason of violation of applicable conflict of interest provision of a statute, charter, ordinance, or regulation.

Some cases hold that a vote cast by a disqualified member, even if it is immaterial to the outcome, vitiates the decision in which such member participated. *Baker v. Marley,* 8 N.Y.2d 365, 208 N.Y.S.2d 449 (1960); *Buell v. City of Bremerton,* 80 Wash.2d 518, 495 P.2d 1358 (1972); *Piggott v. Borough of Hopewell,* 22 N.J. Super. 106, 91 A.2d 667 (1952).

Among the reasons given for such decisions are: that public policy forbids the sustaining of an action founded on the vote of a member which affects him personally; self-interest of one member

infects the action of other members, regardless of their disinterestedness; and, it being impossible to determine whether the virus of self-interest affected the result, it must be assumed that it dominated the deliberation.

Other cases take the position that, where the required majority exists without the vote of the disqualified member, his participation in the deliberation and in the voting will not invalidate the result. *Singewald v. Minneapolis Gas Company*, 274 Minn. 556, 142 N.W.2d 739 (1966); *Anderson v. City of Parsons*, 209 Kan. 337, 496 P.2d 1333 (1972); *Eways v. Reading Parking Authority*, 385 Pa. 592, 124 A.2d 92 (1956).

*Eways v. Reading Parking Authority, supra,* followed *Marshall v. Ellwood City Borough,* 189 Pa. 348, 41 A. 994 (1899), which contains the following statement:

[T]he passage of the ordinance did not depend upon the vote of the disqualified member. The council consisted of six members, of whom five were present when the ordinance in question was proposed. The whole five voted in favor of the ordinance, one of them being Mr. Roelofs [the disqualified member]. Four votes were a clear majority of the whole number of councilmen. None of these four members was disqualified, and the ordinance was passed by a majority of the whole number of members without any regard being had to the vote of Mr. Roelofs. His vote, therefore, had no legal efficacy in the passage of the ordinance. ***Does an ordinance which has enough legal votes to sustain it become illegal because there were other persons — one or more — voting in its favor who were not qualified to vote? It would be an astonishing proposition to submit that an ordinance in a body of fifty or one hundred members which was passed by a considerable majority of perfectly qualified votes, should be declared illegal because it had received the supporting vote of one member who was disqualified. ***We know of no reason, in the present case, why the invalid vote of one member of the council should be held to invalidate the perfectly legal vote of the other four members. ***While it must be conceded that, if a majority of those voting for the ordinance, or even one vote, if that vote determined the passage of the ordinance, would establish the invalidity of the ordinance, we cannot think that such a consequence could result from the mere fact that there was only one

member of the council who had an opposing interest, and the ordinance was passed by a majority of legally competent members without any reference to his vote.

We are in accord with the foregoing reasoning. The facts in this case are practically identical with the facts recited in the quoted statement.

Furthermore, in this case, it cannot be said that Kellett was clearly disqualified from participating in the Board decision and order.

At the time the Board entered its decision and order, Revised Honolulu Charter, approved November 7, 1972, was in effect.

That charter provided in Section 10-103 that any member of the city council, who knew that he had "a personal or private interest, direct or indirect," in any proposal before the council, should disclose such interest in writing to the council, the disclosure to be made a matter of public record "prior to the taking of any vote on such proposal," thus implying that, upon the filing of the required disclosure, such member was eligible to vote on the proposal.[1]

The section also required any appointed officer of the city and county, "who possesses or who acquires" such interests as might reasonably tend to create a conflict with the public interest, to make full written disclosure to his appointing authority and to the ethics commission at any time such conflict became apparent, the disclosure to be filed with the city clerk and made a matter of public record, but, unlike the provision discussed in the preceding paragraph, was silent regarding the eligibility of such officer to vote on the matter covered in the disclosure.

---

[1] Section 10-103, the language of which is identical with Section 11-103, of the charter presently in effect, read as follows:

Any elected or appointed officer or employee who possesses or who acquires such interests as might reasonably tend to create a conflict with the public interest shall make full disclosure in writing to his appointing authority or to the council, in the case of a member of the council, and to the ethics commission, at any time such conflict becomes apparent. Such disclosure statements shall be made a matter of public record and be filed with the city clerk. Any member of the council who knows he has a personal or private interest, direct or indirect, in any proposal before the council, shall disclose such interest in writing to the council. Such disclosure shall be made a matter of public record prior to the taking of any vote on such proposal.

However, there is some question whether the section applied to Kellett in that, at the time he participated in the Board decision and order, he did not possess, and had not yet acquired any conflicting interest, the matter disclosed by him to the Board being prospective and contingent.

(b) Multiple role of the office of Corporation Counsel in advising the Board, representing the Building Department and Yuasa, and in preparing the letter signed by the Mayor which was introduced in evidence.

This contention has reference to the following facts: that deputy corporation counsel John Nishimoto advised the Board at the hearing and in its deliberation on the case; that deputy corporation counsel Wesley Fong acted as attorney for the Building Department and Yuasa in presenting the case at the Board hearing; and that deputy corporation counsel Robert Teruya prepared the letter signed by the Mayor regarding Ordinance No. 4617, which was introduced in evidence at the hearing.

A short answer to the contention is that the general rule that an appellate court will consider only such questions as were raised and reserved in the lower court applies on review by courts of administrative determinations so as to preclude from consideration questions or issues which were not raised in administrative proceedings. *Petition of Village Board of Wheatland*, 77 N.D. 194, 42 N.W.2d 321 (1950).

The record shows that, at the Board hearing, plaintiff's attorney knew that Nishimoto was advising the Board; that Fong was presenting the case on behalf of the Building Department and Yuasa; and that Teruya had prepared the letter signed by the Mayor regarding Ordinance No. 4617, which was introduced in evidence. Yet, plaintiff's attorney did not interpose any objection with regard to those matters at the hearing.

(c) Limitation by the Board of plaintiff's cross-examination on critical issues.

HRS § 91-10(3) provides that every party shall have the right to conduct such cross-examination as may be required for a full and true disclosure of facts.

The record shows that the chairman of the Board sustained Fong's objections to four questions propounded by plaintiff's attorney on cross-examination.

An examination of those questions shows that they were not designed to elicit full and true disclosure of facts, but were repetitious in that they had been asked and answered, and were argumentative, irrelevant and immaterial to the issues in the case.

(d) Board was influenced by facts which were neither in the record nor judicially noticeable.

This contention is concerned with two letters which Fong submitted in evidence, but withdrew upon objection by plaintiff's attorney.

Upon withdrawing the letters, Fong expressed the hope that the Board would take "judicious notice" of the same. Plaintiff's attorney did not object when Fong made that statement.

The record is insufficient for a ruling on the contention. Because the letters were withdrawn, the record does not show the exact contents thereof, nor is there anything in the record to show that the Board was influenced by those letters. In the circumstance, to say that the Board was influenced by those letters will be purely speculative.

With respect to the fourth and final question presented for decision on this appeal, it is plaintiff's contention that the actions of the Building Department in connection with Building Permit No. 58584 were unauthorized and void under HRS Chapters 343 and 344, in that they were taken without any assessment of the environmental effects of the proposed development and without any determination of the necessity for the filing of environmental impact statements.

HRS Chapter 343 established a system of environmental review in connection with development programs in certain areas, including the Waikiki-Diamond Head area of Oahu, in which the project site covered in Building Permit No. 58584 is located, by providing for the filing of environmental impact statements, to insure that environmental concerns are given appropriate consideration in decision making.

HRS Chapter 344 enunciated an environmental policy of the State of Hawaii, and provided, in connection therewith, guidelines to be considered by governmental agencies, such as the Building Department, in pursuance of the policy so enunciated.

Under the posture of this case here, plaintiff's contention requires no consideration because of the operation of the limitation of actions provision in HRS § 343-6(a), which reads:

Any judicial proceeding, the subject of which is the lack of determination that a statement is or is not required for a proposed action not otherwise exempted, shall be initiated within 180 days of the agency's decision to carry out or approve the action, or if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within 180 days after the proposed action is started.

In this case, the agency's decision to carry out or approve the action was the approval and issuance of Building Permit No. 58584, which took place on November 26, 1975; and the proposed action undertaken without a formal determination by the agency that a statement was or was not required was the commencement of work under Building Permit No. 58584, by the driving of a pile on the project site on February 20, 1976.

Plaintiff initiated the judicial proceeding in the case by filing its complaint in the circuit court on January 18, 1977, which was 419 days after the issuance of Building Permit No. 58584 and 329 days after the commencement of work under that permit.

Plaintiff argued in its brief that the Building Department extended Building Permit No. 58584 on September 18, 1976, which was 121 days before the filing of its complaint, and that the extension was an agency action requiring environmental assessment.

The record does not show that the alleged extension was granted on that day. On that day, Horita was in compliance with Revised Ordinances 1969, Sec. 18-5.4(b), and no extension was necessary.

Plaintiff further argued that on September 30, 1977, the Building Department approved Horita's request for extension of time to complete all foundation and structural work of the building described in Building Permit No. 58584 beyond the period specified in Ordinance No. 4617. Under our holding earlier in this opinion, that period would have expired on February 9, 1978.

The response of the Building Department to the request was not an approval. It stated:

Since the subject matter is before the Circuit Court, we will not

take any action toward revocation of the building permit until the matter is resolved in the Court.

The circuit court did not rule on plaintiff's contention. So, it is not before this court on this appeal.[2]

Affirmed.

*James M. Sattler (Anne L. Williams* and *Matthew J. Yingling* with him on the briefs) for plaintiff-appellant.

*J. W. Ellsworth* and *Kinji Kanazawa* for defendant-appellee Herbert K. Horita.

*John S. Nishimoto* and *Wesley F. Fong,* Deputies Corporation Counsel, for appellees City & County of Honolulu and Ernest Yuasa.

---

[2] The transcript of the circuit court hearing on February 22, 1978, shows the following:

THE COURT: Well, with reference to the matter of whether or not the defendant is entitled to an extension under the ordinance or not, the court rules that it is not before the court and has no jurisdiction on this matter, that it is properly a determination for the Building Department first and then if necessary the Board of Appeals to hear the matter, depending on what the department should decide under those conditions. I'm not going to predict what the department is going to do with reference to that.

And therefore, as far as that matter is concerned, the court will rule that it has no jurisdiction on this matter.